Lee F. Bantle (LB-7036)
Bantle & Levy LLP
817 Broadway
New York, New York 10003
212.228.9666
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
STEVEN GARCIA,                                   :
                                                 :
                          Plaintiff,             :    COMPLAINT
                                                 :
     -against-                                   :    Jury Trial Demanded
                                                 :
MOHAWK INDUSTRIES, INC.,                         :    05 CIV 2748 (SHS/DFE)
                                                 :
                          Defendant.             :
-------------------------------------------------------x

Plaintiff, Steven Garcia, by his attorneys, Bantle & Levy LLP, alleges for his complaint against defendant as follows:

NATURE OF THE ACTION

1. This is an action to remedy discrimination on the basis of (a) disability and (b) national origin in the terms, conditions and privileges of employment under the New York State Human Rights Law, New York Executive Law §290 *et seq.*, (the "NYSHRL") and the New York City Human rights Law, New York City Administrative code, §8101 *et seq.*, (the "NYCHRL"). This is also an action for fraudulent inducement and for violation of New York State Judiciary Law for the penalty Mr. Garcia was made to suffer as a result of performing jury service.

1

2       Mr. Garcia was employed by Mohawk from 2002 until his discharge on October 4, 2004.

## JURISDICTION AND VENUE

3.      This suit constitutes a dispute between citizens of different states and includes an amount in controversy in excess of $75,000.00.  This court thus has jurisdiction over the action by virtue of 28 U.S.C. §1332(a).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C §1391(a) as plaintiff resides in the Southern District of New York.

5.      This court has personal jurisdiction over the defendant in that the defendant regularly solicits, engages and otherwise transacts business within the State of New York.  Plaintiff's employment with defendant, which is the subject of this action, took place in New York.

## PARTIES

6.      Plaintiff, Steven Garcia, is a citizen of the United States and the State of New York and resides at 130 Lenox Avenue, #908, New York, New York 10026.  Mr. Garcia is of Cuban descent.

7.      Upon information and belief, Defendant Mohawk Industries, Inc. ("Mohawk" or the "Company") is a corporation organized and existing under the laws of the State of Delaware with its principle place of business at 160 South Industrial Blvd., Calhoun, Georgia 30701.   Mohawk is in the business of selling commercial carpets throughout the United States and internationally.

STATEMENT OF FACTS

8. Prior to accepting employment with Mohawk, Mr. Garcia was a highly successful sales representative in the commercial carpeting industry with many large remunerative accounts.

9. In October 2002, he was actively recruited by Mohawk for a position as Territory Manager working out of the New York office.

10. Upon information and belief, in seeking to have Mr. Garcia join Mohawk, the Company was influenced by Mr. Garcia's high level of success in the industry and his valuable client relations with many large companies.

11. Before accepting a position with Mohawk, Mr. Garcia was told that Mohawk had perfected a new "stain-free" carpet technology – Everset – and that none of Mohawk's competitors would be able to compete with it. Mr. Garcia was told that the new product was ready to launch.

12. One of the reasons Mr. Garcia agreed to leave a secure, well-paid position with a Mohawk competitor was because he believed that Everset was ready to launch and that this new technology would provide a significant competitive advantage.

13. While working for Mohawk, Mr. Garcia set the national standard for demonstrating the stain-removing powers of the Everset System and trained Mohawk's other Northeast sales representatives on the product's features. Mr. Garcia was dubbed the "Everset expert" because of his thorough knowledge of which stains could be removed from Mohawk carpets treated with Everset.

14. Mohawk, however, had not perfected the stain-free technology because, among other things application of Everset changes a carpet's color dramatically. Everset

carpeting samples continually failed the testing criteria and the product was, in fact, not ready to launch in 2002. As of the date of Mr. Garcia's termination in October 2004, the Company still could not deliver the Everset product on many of its carpets.

15. At the time Mohawk made representations to Garcia that it had perfected Everset and that the new technology was ready to launch, Mohawk knew these representations were false.

16. Despite the fact that Everset had not been perfected, in 2002 and 2003 Mohawk instructed Mr. Garcia (and presumably other sales representatives) to represent to potential clients that the Everset technology was available.

17. Mr. Garcia relied on this advice in making a large sale to UBS, a client which he brought to Mohawk.

18. Mohawk, however, was unable to fulfill the UBS contract for the Everset product. After a series of embarrassing failures and incompetent efforts at implementation, UBS cancelled the contract it had signed with Mohawk to purchase the stain-free product for as many as 500 of its branch offices. This 2003 contract along with Mr. Garcia's forecast sales for 2004, for UBS alone, were projected to be at least $400,000.00 in revenues.

19. During the period that Mohawk was experiencing difficulties in fulfilling the UBS contract, one of its other divisions, Lees Carpets, began pursuing the UBS business.

20. This activity by the sales representatives of Lees Carpets violated strict rules of engagement among the Mohawk divisions, which prohibit competition for the business among divisions.

4

21. Mr. Garcia complained about the prohibited competition to management.

22. Despite the fact that such prohibited competition is a terminable offense, upon information and belief, no discipline was imposed on the Lees Carpets sales representatives who competed with Mr. Garcia for the UBS business.

23. As a result of Mohawk's failure to deliver product to UBS, Mr. Garcia's relationship with UBS, which had been one of his most profitable, long-standing accounts, was seriously damaged.

24. Other failures of performance by Mohawk prevented Mr. Garcia from doing business with Tishman Speyer, Radio City, Madison Square Garden, Blue Cross and GMAC Finance Corp.

25. During the course of his employment with Mohawk, Mr. Garcia suffered from several serious medical conditions. In November 2003, he developed debilitating back pain which imposed limitations on his ability to work for several months.

26. In May 2004, he was diagnosed with diverticulitis for which he was nearly hospitalized. This condition sidelined him for two weeks and required ongoing monitoring and testing thereafter.

27. Mr. Garcia experienced substantial weight loss due to these conditions and also because of the stress he was experiencing as a result of Mohawk's inability to deliver the products that he had sold.

28. As a result of his medical conditions, Mr. Garcia was mocked by numerous Mohawk employees, including Larry Queen, the district manager, who told Mr. Garcia in June 2004 that he looked like Tom Hanks from the movie *Philadelphia*.

29. Mr. Garcia's nationality was also demeaned by co-workers through comments such as "you know how Puerto Ricans and Mexicans are…," "you can't trust greasy wetbacks," along with jokes about his "greasy" hair, and about his coming to the U.S. on a raft.

30. When Mr. Garcia was demonstrating stain removal processes to other sales representatives, the comment was made that "we get the Spanish guys to do the cleaning."

31. Instead of providing Mr. Garcia with the reasonable accommodation that he needed due to his disabilities – time off to receive treatment and recover – he was placed on probation by Mr. Queen in July 2004 for poor sales performance. Mr. Garcia learned in the Summer of 2004 that Mohawk wanted to get rid of him.

32. Not only did this probation fail to account for the fact that Mr. Garcia had been too ill to work for some of the period in question and that Mohawk had been unable to deliver the carpeting that Mr. Garcia had sold, the probation also failed to account for Mr. Garcia's month-long jury service in February 2004. Despite his legal obligation to serve, Mr. Garcia learned that management had been unhappy with the fact of of his jury service and held it against him.

33. In late August 2004, Mr. Garcia contracted a serious mouth virus. His condition continued to deteriorate in September. He developed ulcerations in his mouth, swelling and substantial pain. He disclosed his condition to Mohawk on September 23, 2004 and advised that he would need time off to recover.

34. On September 24, 2004, at Mohawk's request, Mr. Garcia provided a doctor's note which stated, among other things, that "chewing, speaking, and eating are

exceptionally painful, and often a fever accompanies these symptoms." Although Mr. Garcia began taking prescribed medication, his condition continued to worsen. His illness interfered with his ability to sleep and caused severe head, ear and neck pain.

35. Due to the seriousness of his illness, Mr. Garcia missed the following two weeks of work, including a weekly sales meeting on October 4, 2004.

36. Around noon on October 4, 2004, Mr. Garcia spoke with Mr. Queen who asked why he had missed the meeting. Mr. Garcia advised him that he was still sick and in pain. Despite hearing this and having Mr. Garcia's doctor's note, Mr. Queen terminated Mr. Garcia's employment that very day.

## COUNT I
(Disability Discrimination in violation of New York State Law)

37. Plaintiff repeats and realleges the allegations contained in paragraphs 1 though 36 as if they were fully restated herein.

38. By its actions, Mohawk has violated the New York State Executive Law, §290 et seq., commonly known as the New York Human Rights Law, by discrimination on the basis of disability.

39. As a result of Mohawk's discrimination, Mr. Garcia has suffered damage, including, without limitation, deprivation of income and benefits, the unlawful termination of his employment as well as emotional pain, suffering, inconvenience, mental anguish, humiliation and damage to his reputation and career.

COUNT II
(Disability Discrimination in violation of New York City Law)

40.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 though 39 as if they were fully restated herein.

41.     By its actions, Mohawk has violated the New York City Administrative Code, §8101 et seq., commonly known as the New York Human Rights Law, by discrimination on the basis of disability.

42.     As a result of Mohawk's discrimination, Mr. Garcia has suffered damage, including, without limitation, deprivation of income and benefits, the unlawful termination of his employment as well as emotional pain, suffering, inconvenience, mental anguish, humiliation and damage to his reputation and career.

COUNT III
(National Origin Discrimination in violation of New York State Law)

43.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 though 42 as if they were fully restated herein.

44.     By its actions, Mohawk has violated the New York State Executive Law, §290 et seq., commonly known as the New York Human Rights Law, by discrimination on the basis of national origin.

45.     As a result of Mohawk's discrimination, Mr. Garcia has suffered damage, including, without limitation, deprivation of income and benefits, the unlawful termination of his employment as well as emotional pain, suffering, inconvenience, mental anguish, humiliation and damage to his reputation and career.

## COUNT IV
(National Origin Discrimination in violation of New York City Law)

46. Plaintiff repeats and realleges the allegations contained in paragraphs 1 though 45 as if they were fully restated herein.

47. By its actions, Mohawk has violated the New York City Administrative Code, §8101 et seq., commonly known as the New York Human Rights Law, by discrimination on the basis of national origin.

48. As a result of Mohawk's discrimination, Mr. Garcia has suffered damage, including, without limitation, deprivation of income and benefits, the unlawful termination of his employment as well as emotional pain, suffering, inconvenience, mental anguish, humiliation and damage to his reputation and career.

## COUNT V
(Fraudulent Inducement)

49. Plaintiff repeats and realleges the allegations contained in paragraphs 1 though 48 as if they were fully restated herein.

50. Mohawk knowingly and materially misrepresented to Mr. Garcia, at the time he was hired, that its Everest technology was ready to launch.

51. As Mohawk intended, this misrepresentation was a factor in inducing Mr. Garcia to leave his previous employment and join Mohawk.  This misrepresentation was also a factor in inducing Mr. Garcia to bring his most profitable and long-standing clients to Mohawk and sell them Everset carpet.

52. As a result of Mohawk's subsequent failure to deliver the Everset carpet, and the unlawful termination of his employment, Mr. Garcia suffered damage, including,

without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, mental anguish, humiliation and damage to his reputation and career.

## COUNT VI
(Violation of New York Judiciary Law §519)

53. Plaintiff repeats and realleges the allegations contained in paragraphs 1 though 52 as if they were fully restated herein.

54. Mohawk placed Mr. Garcia on probation in July 2004 for poor sales performance without taking into account his month-long jury service in February 2004, which displeased Mohawk management. Mohawk's actions violate New York State Judiciary Law §519 which prohibits an employer from penalizing an employee due to their jury service.

55. As a result of the foregoing, Mr. Garcia suffered damage, including, without limitation, deprivation of income and benefits, the unlawful termination of his employment as well as emotional pain, suffering, inconvenience, mental anguish, humiliation and damage to his reputation and career.

WHEREFORE, plaintiff requests judgment as follows:

1. On plaintiff's first cause of action, an amount to be determined at trial but not less than $1,000,000.

2. On plaintiff's second cause of action, an amount to be determined at trial but not less than $1,000,000.

  3. On plaintiff's third cause of action, an amount to be determined at trial but not less than $1,000,000.

  4. On plaintiff's fourth cause of action, an amount to be determined at trial but not less than $1,000,000.

  5. On plaintiff's fifth cause of action, an amount to be determined at trial but not less than $1,000,000.

  6. On plaintiff's sixth cause of action, an amount to be determined at trial but not less than $1,000,000.

  7. Grant plaintiff his attorney fees, costs and disbursements and such other and further relief as the Court deems just and proper.


Dated: New York, New York
    March 9, 2005

               BANTLE & LEVY LLP


               By:_____
                 Lee F. Bantle (LB-7036)

               817 Broadway
               New York, New York 10003
               212-228-9666

               Attorneys for Plaintiff Steven Garcia


       PLAINTIFF DEMANDS TRIAL BY JURY